729 P.2d 905

**William CHAMBERLAIN and Lois Ellen Chamberlain, his wife; Wilda Dearie, a single person; Sue Ann Gundy, a single person; Arthur Reeves and Ernie Reeves, husband and wife; Michael J. Savino and Patricia Savino, his wife, Plaintiffs-Appellants,**

v.

**Donald B. MATHIS and Jane Doe Mathis, husband and wife; the Arizona Department of Health Services, its Director, Donald B. Mathis, John Does I through XX inclusive; and ABC through XYZ corporations inclusive, Defendants-Appellees.**

**No. 18414–PR.**

Supreme Court of Arizona.

Nov. 24, 1986.

552

Renaud, Cook, Videan, Geiger & Drury, P.A. by Steve T. Skivington, Phoenix, for plaintiffs-appellants.

Winston & Strawn by Jeffrey C. Brodin, Daniel D. Maynard, Phoenix, for defendants-appellees.

FELDMAN, Justice.

This defamation action was brought by William Chamberlain, Wilda Dearie, Sue Ann Gundy, Arthur Reeves, and Michael J. Savino (plaintiffs) against Donald Mathis (Mathis), Director of the Arizona Department of Health Services (ADHS). The trial court dismissed plaintiffs' complaint on the grounds that Mathis enjoyed an absolute privilege. The court of appeals reversed, holding that there was no absolute privilege and that whether Mathis was entitled to "high level executive" immunity was a question of fact for the jury. *Chamberlain v. Mathis*, No. 1 CA–CIV 7750 (Ariz. Ct.App. Aug. 27, 1985) (memorandum decision). We accepted review to clarify the law regarding immunity for executive government officials. Rule 23(c)(4), Ariz.R. Civ.App.P., 17A A.R.S. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

## FACTS

Plaintiffs, ADHS employees, comprised the internal audit staff of the Arizona Health Care Cost Containment System (AHCCCS). The AHCCCS was administered by McAuto Systems Group, Inc. (MSGI) pursuant to an administrator contract between the State of Arizona and MSGI. Plaintiffs audited the administrator contract and submitted a draft of that audit to Mathis on May 4, 1983. Plaintiffs allege that the audit was performed in accordance with generally accepted auditing standards and that the audit report's recommendations were made in good faith.

Mathis refused public access to the audit report. However, in the presence of several individuals, including a newspaper reporter, Mathis made several allegedly defamatory comments regarding the audit and ADHS employees:

The [audit] was prepared by Department of Health personnel who are incompetent and unqualified as auditors.

I've got a bunch of employees in this department, who, I think, have a rich fantasy life.

Charges of covering up failings in the AHCCCS were made by uninformed dissidents in my own department.

I am convinced that McAuto Systems Group, Inc. would sue me if I released the [audit] before the Attorney General reviewed it.

Mathis's comments were published in *The Arizona Republic* on Sunday, August 14, 1983. Plaintiffs contend that Mathis, acting in his capacity as ADHS director, made the above statements maliciously, knowing that they were false.

Mathis was appointed ADHS director by the governor. A.R.S. § 36–102(C). He served at the governor's pleasure, *id.,* and was responsible for the "direction, operation and control of" ADHS. A.R.S. § 36–102(B). Mathis was to oversee "[p]rogram coordination, evaluation and development" and was charged with administering the department's accounting functions. A.R.S. §§ 36–104(1)(a), (d)(ii). He also was authorized to "[p]rovide information and advice on request by [public] agencies and by private citizens, business enterprises and community organizations on matters within the scope of [ADHS's] duties...." A.R.S.

§ 36–104(9). His position in state government is roughly comparable to that of a federal cabinet officer.

In considering the propriety of Mathis's motion to dismiss, *see* Rule 12(b)(6), Ariz.R. Civ.P., 16 A.R.S., we assume plaintiffs' allegations are true. *Summerfield v. Superior Court,* 144 Ariz. 467, 470, 698 P.2d 712, 715 (1985). Viewing the facts in this light, we examine the procedural propriety of Mathis's motion to dismiss and then the scope of immunity for executive officials.

## DISCUSSION

### A. *Procedural Issues*

Plaintiffs argue that Mathis's motion to dismiss should have been denied because absolute immunity is an affirmative defense that should have been raised in Mathis's answer, rather than in a motion to dismiss for failure to state a claim. In general, Rule 8(d), Ariz.R.Civ.P., 16 A.R.S., requires defendants to plead affirmative defenses in their answer. However, we have previously held that the defense of immunity "may be properly raised in a motion to dismiss, if the facts establishing the occasion for the privilege[1] appear in the pleadings." *Green Acres Trust v. London,* 141 Ariz. 609, 613, 688 P.2d 617, 621 (1984) (footnote added); *see also Sierra Madre Dev., Inc. v. Via Entrada Townhouses Ass'n,* 20 Ariz.App. 550, 552, 514 P.2d 503, 505 (1973); 2A J. MOORE, MOORE'S FEDERAL PRACTICE ¶ 8.28, at 8–209 (1986) ("The affirmative defense raised by a motion to dismiss may be handled entirely under Rule 12(b)(6) ... where the defense appears on the face of the complaint itself."). We adhere to this exception to Rule 8(d) because it "is more in keeping with the general purpose" of our rules of civil procedure "to avoid decisions based on pleading technicalities rather than the merits of a case." 2A J. MOORE, *supra* ¶ 8.28, at 8–207 to 208.

Defendant properly raised the immunity defense in his motion to dismiss because its factual framework was established in plaintiffs' complaint. Plaintiffs had alleged that Mathis was acting in his capacity as ADHS director. Because immunity protects official conduct, the allegation that Mathis was acting in his capacity as director of ADHS is sufficient to support an immunity defense.

Once an immunity defense has been raised properly, the court determines whether defendants are entitled to immunity. *Green Acres,* 141 Ariz. at 613, 688 P.2d at 621; Restatement (Second) of Torts § 619 (1977). If the existence of immunity turns on disputed factual issues, the jury determines the facts and the court then determines whether those facts are sufficient to establish immunity. If the court finds that Mathis is entitled only to qualified immunity, then the jury generally determines whether he abused his immunity by acting for an improper purpose or in an improper manner. Restatement (Second) of Torts § 619, comment b (1977).

Having determined that Mathis properly raised the defense of immunity in this case and that defining the scope of immunity is a legal question for the court, we turn to the question whether he is entitled to absolute or qualified immunity. The primary distinction between qualified and absolute immunity is that the former protects only those acts done in good faith, while the latter shields all acts, no matter how malicious. *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

### B. *Absolute or Qualified Immunity*

#### 1. *Competing Interests*

The rationale for granting executive government officials immunity for conduct within the scope of their employment is that government must be allowed to govern. If executive officials are denied immunity, they may elevate personal interest

---

**1.** The terms "immunity" and "privilege" are used interchangeably. Although courts have traditionally used "privilege" in defamation actions against government officials, we use "immunity" because we think it better describes the substantive effect of the asserted defense.

above official duty. Public servants would be obligated to spend their time in court justifying their past actions, instead of performing their official duties. Ultimately, government, including good government, may be hampered and qualified individuals may be hesitant to serve in positions that require great responsibility. *See generally Grimm v. Arizona Bd. of Pardons and Paroles*, 115 Ariz. 260, 264–65, 564 P.2d 1227, 1231–32 (1977) (discussing various rationales for judicial and official immunity); Schuck, *Suing Our Servants: The Court, Congress, and the Liability of Public Officials for Damages*, 1980 SUP.CT.REV. 281.

The arguments favoring official immunity are countered by the legitimate complaints of those injured by government officials. *Grimm*, 115 Ariz. at 265, 564 P.2d at 1231. One's reputation is a significant, intensely personal possession that the law strives to protect. The entire common law of defamation attests to the importance we attach to an individual's right to seek compensation for damage to his reputation. *Dombey v. Phoenix Newspapers, Inc.*, 150 Ariz. 476, 479–80, 724 P.2d 562, 565–66 (1986). Not even the critical need for open and robust public debate on issues of public concern is sufficient to completely shield malicious defamations. *New York Times v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964).

The interests furthered by absolute official immunity are also countered by basic principles of equal justice. "Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to [the] law." *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978) (federal executive officials entitled only to qualified immunity when "constitutional tort" is alleged). As we stated in *Grimm*, "[t]he more power bureaucrats exercise over our lives, the more ... some sort of ultimate responsibility [should] lie for their most outrageous conduct." 115 Ariz. at 266, 564 P.2d at 1233. *Grimm* recognized

that imposing liability for wrongful acts serves two important goals: compensating victims and deterring wrongdoers. *Id.*

This case requires us to reconcile the competing interests furthered by immunity and responsibility. In Arizona, as elsewhere, courts generally have reconciled these interests by granting public officials either absolute or qualified immunity. *E.g., Green Acres*, 141 Ariz. at 613, 688 P.2d at 621 (absolute immunity from defamation action for statements made in connection with judicial proceedings); *Portonova v. Wilkinson*, 128 Ariz. 501, 503, 627 P.2d 232, 234 (1981) (qualified immunity for police officer accused of defamation); *Grimm*, 115 Ariz. at 265, 564 P.2d at 1232 (qualified immunity for board of pardons and paroles); *see also* A.R.S. § 41–621(G) (relieving state employees of personal liability for acts within the employee's discretion "done in good faith without wanton disregard of his statutory duties"). Because the decisions just cited establish that government executive employees are presumptively entitled to some immunity, our analysis is limited to a comparison of qualified and absolute immunity. Before proceeding to that comparison, however, it is important to note that not all official conduct is protected by immunity.

### 2. *When is Immunity Available?*

■ Both qualified and absolute immunity protect only acts reasonably within the employee's discretionary authority. Thus, immunity generally will be recognized when officials are setting policy or performing an act that inherently requires judgment or discretion. For example, Mathis's statements regarding plaintiffs' audit were within his discretion because the director of ADHS is charged with overseeing the department's accounting functions and is authorized to provide information on matters within the scope of ADHS's duties. *Ante* at 553, 729 P.2d at 907. Because Mathis had discretion in making a public

statement regarding the audit, he is entitled to some level of immunity.[2]

■ In contrast, it is possible to characterize those situations in which no immunity exists as those involving the performance of ministerial acts, such as driving a car or moving furniture. For example, even though the director of ADHS may drive from point A to point B to carry out his official duties, he has no immunity to drive negligently. Driving is not a discretionary governmental function that must be shielded by immunity for government to function effectively. *Cf. Ryan v. State,* 134 Ariz. 308, 656 P.2d 597 (1982). *See generally* W. PROSSER & W. KEETON, THE LAW OF TORTS § 132, at 1059–69 (5th ed. 1984).

The distinction between ministerial and discretionary acts is often made, but has not proved entirely satisfactory. *See* W. PROSSER & W. KEETON, *supra* § 132, at 1062. The important point is that certain types of activity, such as driving cars, posting warning signs, or moving office furniture are the types of activity for which immunity serves no worthwhile purpose; other types of activity, such as evaluating reports or employees' performances or deciding upon parole release warrant at least qualified immunity in order to advance important public objectives: effective government administered by skilled government officials. *See, e.g., Grimm,* 115 Ariz. at 263, 564 P.2d at 1230; W. PROSSER & W. KEETON, *supra* § 132, at 1062–69.

Because Mathis was acting within his discretionary authority, he is entitled to some level of immunity. The question is whether Mathis is protected by absolute or qualified immunity.

### 3. *Previous Case Law*

Absolute immunity from defamation actions for so-called executive officials became the norm with the United States Supreme Court's decision in *Barr v. Matteo, supra. See, e.g.,* Restatement (Second) of

Torts § 591 (1977) (following *Barr* and granting superior executive state officials an "absolute privilege to publish defamatory matter concerning another in communications made in the performance of his official duties"). *Barr* involved a press release issued by the director of a federal agency. The release announced the director's intention to suspend two employees involved in conduct for which the agency had been criticized. The Court recognized that the director was not required to issue the press release and that a jury may have found that the director acted with malice. Nevertheless, the Court held that because the press release was within the "outer perimeter" of the director's discretion, the director was entitled to absolute immunity. 360 U.S. at 575, 79 S.Ct. at 1341.

> *Barr* reasoned that government officials should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.

360 U.S. at 571, 79 S.Ct. at 1339. It is not enough, the Court reasoned, that honest, good faith mistakes will be protected by qualified immunity or that, presumably, only well-grounded complaints will result in actual liability. The Court held that society's interest in relieving government officials from any judicial inquiry into their motives outweighs the victim's interest in compensation.

> "[I]f it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been

2. Of course, even executive officials do not have discretion to make statements in every conceivable situation. *E.g., Cheatum v. Wehle,* 5 N.Y.2d 585, 159 N.E.2d 166, 186 N.Y.S.2d 606 (1959) (dinner speech attacking other officials not within state conservation commissioner's discretion).

tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties."

360 U.S. at 571, 79 S.Ct. at 1339 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949) (opinion of Judge Learned Hand)).

Our court of appeals followed *Barr* in *Long v. Mertz*, 2 Ariz.App. 215, 407 P.2d 404 (App.1965). *Long* granted absolute immunity to a state highway department official who had commented on the qualifications of a private contractor. With one minor exception,[3] the court of appeals consistently has adhered to the position advocated in *Long*. E.g., *Bugarin v. Wilson Sch. Dist. No. 7*, 17 Ariz.App. 541, 499 P.2d 119 (1972) (allegedly defamatory statement by school district superintendent regarding Mexican-American teachers); *Grande v. State*, 115 Ariz. 394, 565 P.2d 900 (App. 1977) (state tax commission officials' statements in notice of dismissal); *Petroni v. Board of Regents*, 115 Ariz. 562, 566 P.2d 1038 (App.1977) (statements by professors and regents in tenure proceedings); *Wyatt v. Ruck Const., Inc.*, 117 Ariz. 186, 571 P.2d 683 (App.1977) (statements of city contract administrator).

This court has not expressly adopted *Barr* or its rationale. We relied indirectly on *Barr* in *White Mountain Apache Indian Tribe v. Shelley*, 107 Ariz. 4, 480 P.2d 654 (1971), to hold that Indian tribe executive officers and the tribe's general counsel are absolutely immune from defamation charges for "actions ... within the scope of [their] duties as ... public official[s]." 107 Ariz. at 7, 480 P.2d at 657. However, the holding in *White Mountain* was premised in part on the tribe's status as a dependent sovereign not subject to state court jurisdiction. 107 Ariz. at 5, 480 P.2d at 655. The court referred to *Barr* to support its holding that the tribe's general

counsel was entitled to the same immunity from state court jurisdiction as the tribe. Nevertheless, *White Mountain* comes close to adopting *Barr* as the rule to be applied to government executive officials.

More recently, we refused to extend absolute immunity to police officers, *Portonova, supra,* or the board of pardons and paroles, *Grimm, supra.* In both cases we found the protection offered by qualified immunity sufficient to protect government officials acting within the scope of their official duties. Our rejection of absolute immunity in *Grimm* is significant because, like defendant in the instant case, members of the board of pardons and paroles are executive officials appointed by the governor. A.R.S. § 31–401(A) (Supp.1985). Also, the board enjoys wide discretion in the exercise of its duties. A.R.S. § 31–412 (Supp.1985); *Stinson v. Arizona Bd. of Pardons and Paroles*, 151 Ariz. 60, 725 P.2d 1094 (1986). *Grimm* held "that absolute immunity for public officials in their discretionary functions acting in other than true judicial proceedings is not required and, indeed, is improper." 115 Ariz. at 265, 564 P.2d at 1232.

Although *Grimm* abolished absolute immunity for some public officials exercising discretionary authority by overruling earlier cases affording such immunity, it did not explicitly foreclose absolute immunity for "high level" government officials. 115 Ariz. at 266, 564 P.2d at 1233. Statements in our subsequent decisions can be read fairly as giving conflicting signals on this issue. *Compare Ryan v. State*, 134 Ariz. at 310, 656 P.2d at 599 ("[W]e must hasten to point out that certain areas of immunity must remain. The more obvious of such immunities are legislative immunity, judicial immunity, and high-level executive immunity.") *with Carlson v. Pima County*, 141 Ariz. 487, 492, 687 P.2d 1242, 1247 (1984) ("There is no absolute privilege in Arizona for public officers and employees of the state and its political subdivisions.").

3. Division Two refused to follow *Long* in *Martinez v. Cardwell*, 25 Ariz.App. 253, 542 P.2d 1133 (1975). However, it soon overruled *Card-*

*well* and adopted *Long* in *Petroni v. Board of Regents*, 115 Ariz. 562, 566 P.2d 1038 (App. 1977).

### 4. *Resolution*

█ Although there may be some government offices that require absolute immunity, *e.g., Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), we believe the general rule of qualified immunity announced in *Grimm* should govern the case before us. Qualified immunity protects government officials from liability for acts within the scope of their public duties unless the official knew or should have known that he was acting in violation of established law or acted in reckless disregard of whether his activities would deprive another person of their rights. *Butz v. Economou,* 438 U.S. at 497–98, 98 S.Ct. at 2906; *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975); *Green Acres,* 141 Ariz. at 616, 688 P.2d at 624; Restatement (Second) of Torts § 600 (1977). We believe this to be the better rule for several reasons.

We explained in *Grimm* that because immunity "deprives individuals of a remedy for wrongdoing[, it] should be bestowed only when and at the level necessary." *Grimm,* 115 Ariz. at 265, 564 P.2d at 1232. Thus, although we have recognized an absolute immunity for persons participating in judicial proceedings, we have narrowly construed the requirement that the act raising the privilege have a close, direct relationship to such proceedings. *Green Acres,* 141 Ariz. at 614, 688 P.2d at 622. Similarly, in *Ryan v. State,* 134 Ariz. at 311, 656 P.2d at 600, we endorsed the use of governmental "immunity as a defense only when its application is necessary to avoid a severe hampering of a governmental function or thwarting of established public policy."

The case for absolute official immunity is premised on the *assumption* that the possibility of inquiry into official motives or conduct will deter proper and necessary official action. *Barr,* 360 U.S. at 571, 79 S.Ct. at 1339; *Halperin v. Kissinger,* 606 F.2d 1192, 1214 (D.C.Cir.1979) (Gesell, J., concurring). This argument was made with respect to government immunity, *Ryan v. State,* 134 Ariz. at 309, 656 P.2d at 598, immunity for police officers, *Portonova,* 128 Ariz. at 503, 627 P.2d at 234, and immunity for the board of pardons and paroles, *Grimm,* 115 Ariz. at 270, 564 P.2d at 1237 (Hays, J., dissenting). However, after we limited government immunity and granted police officers and members of the parole board qualified, rather than absolute, immunity, neither government, law enforcement, nor the parole system came to a standstill. We are therefore reluctant to base a rule that eliminates both deterrence of public officials and compensation of victims on such speculative grounds. *Barr,* 360 U.S. at 589–90, 79 S.Ct. at 1349 (Brennan, J., dissenting) ("This, I fear, is a gossamer web self-spun without a scintilla of support to which one can point.").[4] We believe that in the vast majority of cases, qualified immunity will adequately protect state executive officials. W. PROSSER & W. KEETON, *supra* § 114, at 822 ("It does not appear" that government has been hindered "in those states where only the qualified privilege is recognized. . . .").

We recognize, however, that qualified immunity may offer executive public officials insufficient protection if plaintiffs, by merely alleging malice, can force public officials to engage in intensive discovery and cumbersome, time-consuming trials. *See Harlow v. Fitzgerald,* 457 U.S. 800, 817, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982) ("the subjective element of a good

---

4. *See also* 2 F. HARPER & F. JAMES, THE LAW OF TORTS § 29.10, at 1645 (1956) (emphasis in original), *quoted in Barr,* 360 U.S. at 588, 79 S.Ct. at 1348–49 (Brennan, J., dissenting):

Where the charge is one of honest mistake we exempt the officer because we deem that an *actual holding of liability* would have worse consequences than *the possibility of an actual mistake* (which under the circumstances we

are willing to condone). But it is stretching the argument pretty far to say that the *mere inquiry into malice* would have worse consequences than the *possibility of actual malice* (which we would not, for a minute, condone). Since the danger that official power will be abused is greatest where motives are improper, the balance here may well swing the other way.

faith defense frequently has proved incompatible with our admonition in *Butz* that insubstantial claims should not proceed to trial"). As Professor Schuck has noted:

> [T]he qualified "good-faith" immunity standard, far from assuring an official that vigorous decision making will be rewarded, is pregnant with risk to him: a rather small risk that he will ultimately be held liable, a somewhat higher risk that the immunity will ultimately be denied, and a substantial risk that a full-dress trial will be necessary to establish its applicability and scope.... It is within the shadow cast by those risks that the official will decide what his duty—to himself as well as to the public—requires of him.

Schuck, *supra*, 1980 SUP.CT.REV. at 330. ▮▮▮▮▮ We believe the negative aspects of suits against public officials will be minimized if plaintiffs, instead of merely alleging subjective malice, are required to establish proof of *objective* malice.[5] Thus, in a defamation case, qualified immunity will protect a public official if the facts establish that a reasonable person, with the information available to the official, "could have formed a reasonable belief that the defamatory statement in question was true and that the publication was an appropriate means for serving the interests which justified the privilege." Handler & Klein, *The Defense of Privilege in Defamation Suits Against Government Executive Officials*, 74 HARV.L.REV. 44, 68 (1960); *see also Harlow v. Fitzgerald*, 457 U.S. at 816–17, 102 S.Ct. at 2737–39.[6]

Although a subjective inquiry may suffice in most common law actions, we believe it is inappropriate for public officials. The loss of time and expense incurred by claims brought against public officials will be minimized by avoiding lengthy discovery procedures that delve into the mind of the defendant in an attempt to ascertain his subjective motives. The use of an objective test for public officials is not a favor bestowed upon such officials. Instead, it flows from the need to keep public officials available to perform their duties and from recognition that lawsuits are filed against the innocent as well as the guilty. *Halperin v. Kissinger*, 606 F.2d at 1214–15 (Gesell, J., concurring).

In our view, the adoption of an objective test for determining malice, use of rigid pretrial scrutiny to eliminate frivolous claims, *cf. Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and willingness of trial judges to impose sanctions under Rule 11 for claims that are frivolous or intended to harass will provide sufficient protection against the perils described in *Barr v. Matteo*.[7] At the same time, the adoption of a general rule of qualified immunity for executive government officials will deter those who would intentionally misuse power and will compensate those who are wronged by abuse of power. *Harlow v. Fitzgerald*, 457 U.S. at 819, 102 S.Ct. at 2739.

Our conclusion is bolstered by recent federal caselaw. Since its pronouncement of absolute immunity in *Barr*, the United States Supreme Court has granted federal and state officials only qualified immunity for violation of statutory and constitutional rights. Thus, state governors, presidential aides, and executive cabinet officials now enjoy only qualified immunity for statutory

---

5. If plaintiffs are public officials and the allegedly defamatory statements raise matters of public concern, plaintiffs must establish actual malice with clear and convincing evidence. *Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Dombey, supra.*

6. Of course, this objective standard does not shield a public official who *knew* his statements were false, even though a reasonable person in the official's situation may have had reasonable grounds for believing the statements were true.

7. On a case by case basis some officials may be able to establish a need for absolute immunity. *See Nixon v. Fitzgerald, supra.* However, government officials seeking absolute exemption from personal liability bear "the burden of showing that public policy requires an exemption of that scope." *Butz*, 438 U.S. at 506, 98 S.Ct. at 2911. Also, public officials are obviously immune from liability for completely nondiscretionary acts that they are required to perform in a certain manner.

**560**

and constitutional violations. *E.g., Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (state governor); *Harlow v. Fitzgerald, supra* (presidential aides); *Butz, supra* (presidential cabinet officials). In addition, the Court has adopted an objective standard to determine whether qualified immunity is available. *Harlow v. Fitzgerald,* 457 U.S. at 816–17, 102 S.Ct. at 2737–39.

In its more recent decisions recognizing only qualified immunity, the Supreme Court has distinguished *Barr* solely on the grounds that it involved a common law action, instead of a statutory or constitutional claim. *E.g., Butz,* 438 U.S. at 494–95, 98 S.Ct. at 2904–05. We think the distinction between statutory or constitutional violations and common law wrongs is insignificant at best. The rationale for absolute immunity is that officials will be deterred by the fear of liability from performing their duties. But it "cannot be seriously argued that an official will be less deterred by the threat of liability for unconstitutional conduct than for activities which might constitute a common-law tort." *Butz,* 438 U.S. at 522–23, 98 S.Ct. at 2919 (Rehnquist, J., dissenting). Also, common law actions often can be rephrased in statutory or constitutional terms; it makes little difference to the victim whether he was injured by a common law, constitutional, or statutory violation. *Id.;* Schuck, *supra,* 1980 SUP.CT.REV. at 324. If qualified immunity offers sufficient protection against liability for constitutional wrongs, then it is also sufficient in cases alleging common law torts.

### CONCLUSION

▪ We hold that Mathis is entitled to qualified immunity from liability for his allegedly defamatory statements concerning plaintiffs. He forfeits his immunity if, and only if, he (1) acted outside the outer perimeter of his required or discretionary functions, or (2) acted with malice in that he knew his statements regarding plaintiffs were false or acted in reckless disregard of the truth. The reasonableness of

Mathis's conduct should be measured by an objective standard. *Ante* at 558–559, 729 P.2d at 912–913.

The trial court's order of dismissal is reversed. The court of appeals' decision is vacated. This case is remanded for further proceedings consistent with this opinion.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.